UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TODD HINZ,

                              Plaintiff                    DECISION AND ORDER

-vs-
                                                          13-CV-6302 CJS(JWF)
VILLAGE OF PERRY,

                              Defendant
_____

APPEARANCES

For Plaintiff:              Ryan C. Woodworth, Esq.
                            The Woodworth Law Firm
                            16 East Main Street, Suite 732
                            Rochester, New York 14614

For Defendant:              Mary E. Shephard, Esq.
                            James S. Wolford, Esq.
                            The Wolford Law Firm LLP
                            600 Reynolds Arcade Building
                            Rochester, New York 14614


INTRODUCTION

        This is an action in which Todd Hinz ("Plaintiff"), who suffers from Chron's disease,

alleges that his former employer, the Village of Perry, New York ("the Village" or

"Defendant"), discriminated against him because of that condition, and retaliated against

him, in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et

seq.*.  Now before the Court is Defendant's motion for summary judgment (Docket No.

[#26]).   Because Plaintiff has not come forward with any evidentiary proof in admissible

form that the Village was aware of his medical condition, that it perceived him as having

such a condition or that he engaged in protected activity, Defendant's application is

granted and this action is dismissed.

1

BACKGROUND

Except as otherwise indicated the following are the facts of this case, viewed in the light most favorable to Plaintiff, and mostly taken from Plaintiff's sworn deposition testimony.  Plaintiff worked for the Village as a wastewater treatment operator and temporary water operator between 1998 and 2002, before leaving to take a similar job with another municipality.  In 2006, the Village's Superintendent, Edward Koziel ("Koziel"), asked Plaintiff to return to work for the Village as Chief Operator of the Water Treatment Plant, which Plaintiff did upon being appointed to that position by the Village Board.  In February 2007, the Village promoted Plaintiff to the position of Chief Operator of the Water and Wastewater Treatment Plants.  The Village gave Plaintiff annual pay raises and consistently favorable performance reviews during his term of employment.[1]

Throughout the period relevant to this lawsuit, 2011-2012, Plaintiff was supervised by Koziel and by Koziel's supervisor, Village Administrator Terrence Murphy ("Murphy").  Plaintiff would usually see Koziel once a day, in the morning when Koziel would "stop in" at the water treatment plant for about a half hour to an hour.  Plaintiff would meet with Murphy once per week, prior to Village Board Meetings.[2]

Beginning in the early 1990s, Plaintiff was diagnosed with Chron's disease.  Plaintiff had Chron's disease throughout both periods of his employment with the Village, but he never told anyone at the Village about his medical condition.[3]  Moreover, Plaintiff

---

[1] Pl. Deposition at p. 26.

[2] Pl. Deposition at pp. 23, 24.  Contradictorily, Plaintiff later indicated in his deposition that he saw Murphy "daily."  *Id*. at p. 27.

[3] *See* Pl. Dep. at pp. 58, 59-60, where Plaintiff testified that he never told Koziel, Murphy, any of his co-workers or anyone else employed by the Village about his Chron's disease.

does not know whether anyone at the Village believed that he had some type of "problem."[4]  In any event, as a result of Chron's disease, Plaintiff sometimes[5] used the bathroom three to four times per day.[6]  In that regard, when Plaintiff needed to use the bathroom he simply stopped what he was doing, used the bathroom, and then returned to work.  Between 2006 and 2011, Plaintiff generally felt "okay" while working for the Village between 2006 and 2011, and was not taking medication.  Plaintiff never requested any accommodation from the Village concerning his condition, and he took only approximately five sick days during the period between 2006 and 2012.[7]

In the Spring of 2012 Plaintiff began to experience "extreme diarrhea"[8] at work, though not every day.[9]  Koziel was usually not in a position to monitor the number of times that Plaintiff used the bathroom per day, since he was usually at the Water Treatment Plant only in the mornings, for about an hour.  However, it appears that in the Spring of 2012 Plaintiff was often in the bathroom at times when Koziel would visit the Water Treatment Plant.

---

[4]Pl. Dep. at pp. 58-59.

[5]Plaintiff testified, "Crohn's disease it may be fine for two weeks and then you may have a flare up. It all depends." Pl. Dep. at p. 50.

[6]*See*, Plaintiff's Response to Defendant's Statement of Facts at ¶ 22 ("Plaintiff also suffers from frequent bathroom use as a result of his Chron's disease.  In fact, Plaintiff's Chron's disease causes [him] to have bowel movements at least three (3) to four (4) times a day.").

[7]At deposition Plaintiff testified that he took "possibly five" sick days between 2006 and 2012. Pl. Dep. at p. 58.  Plaintiff now purports to disagree with the Village's record of his sick days, but he has not come forward with any evidence to refute it, stating only that he is "not sure how many sick days he took off for his Chron's disease." Pl. Response to Def.'s Stmt. of Facts at pare 24.

[8]Pl. Dep. at pp. 50-51.

[9]Pl. Dep. at p. 55.  Plaintiff indicated that the extreme diarrhea occurred "possibly" every other day, but "at least more than once a week."

Plaintiff maintains that Koziel was a "bully" who was frequently angry at work and "often inappropriate" in his treatment of employees.[10]  Plaintiff contends that prior to the Fall of 2011, his own interactions with Koziel were not always "good," because Koziel would "throw temper tantrums" when "he didn't get his way."[11]  Then, in the Fall of 2011, Plaintiff believes that Koziel became upset after Plaintiff was the winning bidder on a load of surplus wood that the Village was auctioning off.  Plaintiff contends that after he won the bid for the wood, Koziel's "mood" changed, and he "wasn't happy," because Koziel's father had unsuccessfully bid on the same load of wood.[12]  Plaintiff indicates, though, without explanation, that Koziel's father still took the wood, even though Plaintiff had been the high bidder.[13]  Similarly, Plaintiff indicates that Koziel became upset in 2011 after Plaintiff purchased a "trailer" that Koziel had also been interested in buying.[14]

Plaintiff maintains that throughout the first half of 2012 Koziel made comments about him being in the bathroom.[15]  Because Koziel was only at the Village Water Plant for about an hour each day, he witnessed Plaintiff using the bathroom "maybe once" per day.[16]  Beginning in or about January 2012, on several occasions Koziel observed Plaintiff emerging from the bathroom in the morning and told Plaintiff, "You are full of

---

[10]Pl. Dep. at pp. 34-35, 60, 73.

[11]Pl. Dep. at p. 31; *see also, id.* at p. 84 (Koziel would get upset if things were not done in the way he thought that they should be done.)

[12]Pl. Dep. at pp. 29-30.

[13]Pl. Dep. at p. 96.

[14]Pl. Dep. at p. 33.

[15]Pl. Dep. at p. 59.

[16]Pl. Dep. at p. 68.

shit."[17]  On one occasion in February 2012, when Plaintiff was in the bathroom, Koziel

tied a piece of rope and a piece of wood to the bathroom door handle, to trap Plaintiff

inside, and said, "If you are going to spend all day in the bathroom order a pizza and pass

it through the window."[18]  About that incident, Plaintiff indicates that he "does not know"

whether Koziel was playing a practical joke.[19]  Similarly, on or about June 18, 2012,

Koziel told Plaintiff that he should move his office into the bathroom.[20]  Plaintiff indicates

that Koziel made such comments at times Plaintiff either happened to be in the bathroom,

or to be emerging from the bathroom, when Koziel stopped by the Water Plant, and that

Koziel really had no way of knowing how many times per day he used the bathroom.[21]

Plaintiff subjectively feels that such comments by Koziel pertained to his Chron's

disease, even though he admits that Koziel had no information that he had Chron's

disease or any other disability.[22]  On this point, Plaintiff does "not know" whether he

believes that Koziel could have known that he had Chron's disease from observing him

use the bathroom once per day.[23]  In any event, Plaintiff cannot cite any instance in which

Koziel made a comment suggesting that he believed Plaintiff had "a disability" generally,

---

[17]Pl. Dep. at p. 89.

[18]Pl. Dep. at p. 127.

[19]Pl. Dep. at pp. 93-94.

[20]Pl. Dep. at p. 91; *see also*, p. 93.

[21]Pl. Dep. at p. 92  ("Q. Do you have any reason to believe that he [Koziel] would know that you went to the bathroom multiple times a day?  A.  I don't know.  I don't know.").

[22]Pl. Dep. at pp. 90, 122.

[23]Pl. Dep. at p. 68.

or Chron's disease specifically.[24]

Plaintiff complained to Murphy several times that Koziel was verbally "harassing" him and other employees.[25]  Plaintiff told Murphy that on one occasion Koziel had "locked [him] in the bathroom," and that Koziel was "harassing [him] about being in the bathroom."[26]  Plaintiff also told Murphy that Koziel had asked him whether he was going to have sex in the bathroom with a girlfriend, as another Village employee had done.[27]  Further, in June 2012 Plaintiff complained to Murphy that Koziel had told him that "he won't have a job if Koziel says so," because Koziel was angry that Plaintiff would not sell Koziel one of his shotguns.[28]  However, Plaintiff is "not sure" whether he told Murphy that any of Koziel's comments were related to the frequency of his bathroom usage.[29]  Furthermore, Plaintiff did not tell Murphy that he had a disability, and he does not think that Murphy interpreted his complaints to mean that he had Chron's disease or some other "problem."[30]

Plaintiff maintains that his employment with the Village ended on June 28, 2012,

---

[24] Pl. Dep. at p. 69.  ("Q. Did Mr. Koziel ever say anything to you that made you believe that he knew you had a disability or believe that he knew you had Chron's disease?  A. I don't know.").

[25] Pl. Dep. at pp. 72-73; *see also, id.* at p. 75 ("Q.  Right.  I'm wondering what you said to Mr. Murphy when you complained about Mr. Koziel.  A.  I said to Mr. Murphy that Ed Koziel is out of hand.  He'd use vulgar language, he didn't care."); *id.* at p. 77 ("I told Mr. Murphy that Ed Koziel was harassing me verbally.").

[26] Pl. Dep. at p. 77.

[27] Pl. Dep. at p. 79.

[28] Pl. Dep. at pp. 80-81.

[29] Pl. Dep. at p. 124.

[30] Pl. Dep. at pp. 77-78; *see also, id.* at p. 88 ("Q. Do you believe that Mr. Murphy knew you had a disability?  A.  I don't know."); *id.* at p. 122 ("Q. Mr. Hinz, do you have any reason to believe that either Mr. Koziel or Mr. Murphy knew you had Chron's disease?  A. I don't know.  Q. Do you have any reason to believe that they thought you had a problem?  A. I don't know.").

when he was fired.  In that regard, Plaintiff contends that he was taking a "personal day" and went to retrieve his boat from a marina operated by Koziel's parents, when Koziel and two police officers arrived at the marina and approached him.  Plaintiff further contends that Village Police Chief Jim Case ("Case") told him, "I need your keys and your cell phone.  You're being terminated."[31]

However, the Village provides a much different version of events leading up to the termination of Plaintiff's employment, which Plaintiff does not refute because he claims that he cannot remember.[32]  More specifically, the Village contends that between Friday, June 22, 2012 and Thursday, June 28, 2012, Plaintiff, who was intoxicated at least part of that time, repeatedly stated that he was quitting his job, and then made a statement concerning the Village water supply, and another statement concerning the marina owned by Koziel's parents, that were interpreted as threats.  More specifically, on June 22, 2012, Plaintiff called Koziel at home several times, after work hours, and repeatedly stated that he was quitting his job.  Specifically, Plaintiff stated:  "I can't take it any more.  Fuck Bob Carter, Ray Bzduch, the Village.  I quit."[33]  It is unclear whether Koziel was accustomed to receiving such calls from Plaintiff, but in any event it does not appear that he took any action in response to Plaintiff's calls, or paid much attention to them.

After that weekend, Plaintiff apparently reported for work for the first half of the day

---

[31]Pl. Dep. at pp. 98-99.

[32]Plaintiff generally insists that the Village terminated his employment as opposed to him quitting, but he does not refute any of the specific facts, such as his phone calls to Koziel and the Mayor, which purportedly caused the Village to conclude that Plaintiff had quit his job.

[33]Koziel Dep. at p. 33.

on Monday, June 25th, but then left work and never returned.[34]  Plaintiff contends that he

requested, and was granted, permission to take the afternoon of June 25th through June

28th as personal days,[35] but the Village denies that he made such a request.  In that

regard, Plaintiff contends that his request was oral, but Koziel and Murphy deny that

Plaintiff made any such request, and Koziel indicates that requests for leave had to be

made in writing.

In any event, on Wednesday, June 27, 2012, a resident of the Village contacted

Koziel and told him that Plaintiff had just made the following statement to him:  "Enjoy the

drinking water while you can and listen to the [police] scanner about 7:30 tomorrow

morning.  I will be at Koziel's so you can hear what happens."[36]  Plaintiff's reference to

"Koziel's" was to the marina operated by Koziel's parents, where Plaintiff kept his boat.

Koziel interpreted Plaintiff's statement as threatening in two respects:  First, that

Plaintiff was threatening the Village's water supply; and second, that he was threatening

Koziel's parents.  Consequently, Koziel notified the police, who took a statement from the

citizen who had reported Plaintiff's statement.  Further, on the evening of June 27th,

Koziel gathered Murphy and the Mayor at the Village Offices and placed a telephone call

to Plaintiff.  During the ensuing speaker-phone telephone conversation, Plaintiff told the

---

[34]Pl. Dep. at p. 105.  Accepting as true Plaintiff's contention that he reported to work for the first half of the day on Monday, June 25, 2012, it does not appear that Koziel or Murphy said anything to Plaintiff that morning concerning his drunken telephone calls to Koziel the preceding Friday evening.

[35]Pl. Dep. at p. 105-106  Plaintiff contends that Murphy granted him leave for the afternoon of June 25th through Wednesday June 27th, which he took as "personal time" for issues unrelated to Koziel.  Plaintiff further contends that Koziel granted him an additional day of personal leave for June 28th.  Murphy and Koziel deny granting Plaintiff any such leave.

[36]Koziel Dep. at p. 33.

Mayor, "Take your keys, union phone and water plant and shove them,"[37] and/or, "You can take your village and your job and shove it."[38]  Both Koziel and Murphy contend that Plaintiff was intoxicated during the telephone conversations on June 22nd and June 27th, respectively.[39]

The following day, June 28, 2012, Plaintiff was at Koziel's marina, when Koziel arrived accompanied by Police Chief Case and another police officer.  Case directed Plaintiff to turn over his keys and cell phone, because his employment was being terminated.  Plaintiff complied with the direction and gave the items to Case.  Approximately two weeks later, the Village Board passed a resolution, entitled "Resolution Acknowledging the Resignation of Todd Hinz as Chief Water and Wastewater Treatment Plant Operator of the Village of Perry."[40]  The resolution recites, *inter alia*, that on June 27, 2012, Plaintiff verbally notified Koziel and the Mayor that he was resigning, and that he subsequently "surrendered" his keys and village-issued cell phone and never returned to work or contacted the Village.  According to Murphy, the reason that the Village recognized the termination of Plaintiff's employment was that "[h]e quit coming to work and he told the mayor on the phone that . . . he could take his job and

---

[37]Koziel Dep. at p. 34.

[38]Murphy Dep. at p. 45.

[39]*See*, Koziel Dep. at p. 23, 37-38; Murphy Verified Answer to EEOC Complaint Dep. at ¶ 18(a) ("It was obvious that Hinz was heavily intoxicated or impaired by some other mind altering substance.").  Such lay opinion is admissible. *See, Xiaolu Peter Yu v. Vassar College*, — F.Supp.3d —,  2015 WL 1499408 at *18 (S.D.N.Y. Mar. 31, 2015) ("In a judicial proceeding under the Federal Rules of Evidence, there is near universal agreement that lay opinion testimony about whether someone was intoxicated is admissible.") (citation and internal quotation marks omitted).  Plaintiff has not denied that he was intoxicated, though he claims that he cannot remember what happened.

[40]Docket No. [#26-9].

shove it."[41]

On June 13, 2013, Plaintiff, represented by counsel, commenced this action under the ADA, alleging that the Village discriminated against him "due to his disability, his record of having a disability, and [the Village's] perception that he was disabled." In that regard, the pleading alleged that the Village "had actual notice of [his] medical condition,"[42] and also "regarded" him as having such a condition. The pleading asserted that beginning in January 2012, Koziel began to subject Hinz to a hostile work environment on the basis of Hinz's "actual or otherwise perceived disability," by making insulting comments about Hinz's use of the bathroom. The pleading alleged that Hinz complained twice to Murphy that he was being harassed by Koziel "on the basis of his disability." The pleading further contended that on June 28, 2012, the Village terminated Hinz's employment "for no legitimate reason," and "as a result of his disability and/or perceived disability."

Subsequently Hinz retained a new attorney, and on April 12, 2014 his current attorney filed a request, which the Court granted, to amend the pleading to remove, in his words, the "false allegation" that the Village had actual notice of Hinz's Chron's disease, and to instead rely on the allegation that the Village merely "regarded" Hinz as having a condition protected by the ADA. However, the Complaint [#1], as amended, still alleges that Hinz engaged in protected activity under the ADA by complaining to Murphy that Koziel was harassing him "on the basis of his disability," and that the Village terminated Hinz's employment "as a result of his disability and/or perceived disability." The Court

---

[41]Murphy Dep. at p. 51.

[42]Complaint [#1] at ¶ 17.

construes the Complaint to assert three separate claims under the ADA: 1) discrimination based on the termination of his employment; 2) hostile work environment; and 3) retaliation.

On February 20, 2015, the Village filed the subject motion for summary judgment, which asserts several arguments.  First, the Village contends that Plaintiff cannot establish discrimination based on a disability because it did not perceive him as having a disability and did not fire him.  Instead, the Village contends that it had a legitimate non-discriminatory reason for "terminating" Plaintiff's employment, which is that he stated multiple times that he was quitting, and then failed to report to work.  Second, the Village contends that Plaintiff cannot establish retaliation since he did not engage in protected activity under the ADA, and did not suffer any retaliatory adverse action.  Third and last, the Village contends that Plaintiff cannot demonstrate a hostile work environment on the basis of a disability, since in addition to the fact that there is no evidence that Koziel's alleged statements concerned a disability, they were not sufficiently severe or pervasive in any event.[43]

In opposition to the Village's motion, Plaintiff maintains, first, that there are triable issues of fact as to whether he suffered an adverse employment action, since he maintains that he was fired, even though he can't remember whether he resigned prior to be being fired.[44]  On this point, Plaintiff apparently confuses the standard on a Rule 56 motion with the now-overruled standard for Rule 12(b)(6) motions, since he mistakenly

---

[43]The Village also questions whether a hostile environment claim is actionable under the ADA.

[44]The Court is completely mystified as to how the discussion on pages 3-4 of Plaintiff's memo of law, entitled "Federal Pleading Standard of Review," has any connection to the instant motion or lawsuit.

asserts that the Court can only grant summary judgment on his discrimination claim if it finds that he "can prove no set of facts in support of his claim that he was terminated." Pl. Memo of Law [#32] at p. 6 (emphasis in original).[45]   Plaintiff also incorrectly asserts that Murphy had no personal knowledge as to whether he quit his job, when in fact Murphy's un-challenged testimony is that he was present during the speaker-phone telephone call on June 27, 2012 when Plaintiff told the Mayor to take his job and "shove it."[46]

Plaintiff also contends that there is an issue of fact as to whether the Village regarded him as having a disability covered by the ADA.  On this point, Plaintiff argues that viewing the "totality of the circumstances" surrounding Koziel's alleged comments to Plaintiff, "a reasonable trier of fact could infer that Defendant clearly regarded or perceived Plaintiff as disabled in his ability to control the elimination of waste as well as working [sic]."[47]   In arguing his position, Plaintiff insists that  one may "clearly infer" that the Village "perceived [him] as unable to perform not only his job, but any job at that, because he spends 'all day in the bathroom,'" even though it is undisputed that the Village gave him only favorable performance reviews and annual pay raises.  Indeed, the

---

[45]In this regard, Plaintiff inexplicably cites *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683 (2d Cir. 2001),  which not only dealt with a motion to dismiss, not a motion for summary judgment motion, but which also involved the *Conley v. Gibson* "no set of facts" Rule 12(b)(6) standard that was later abandoned by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). *See, e.g., E.E.O.C. v. Port Auth. of New York and New Jersey*, 768 F.3d 247, 253 (2d Cir. 2014) ("At the time, application of Rule 8 was governed by the standard set forth in *Conley v. Gibson*, which instructs that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. 99.  That standard was abandoned by the Court's later rulings in *Twombly* and *Iqbal*[.]").

[46]*See*, Murphy Dep. at pp. 43-44 ("Q. Do you know who it was that communicated that he as you allege [sic] quit his job?  A.  By phone at one point with Mr. Koziel *and on the phone with the mayor*.") (emphasis added).  Plaintiff contends that there is some ambiguity as to what he meant when he told the Mayor to take his "village job" and "shove it," *see*, Pl. mem of law [#32] at p. 8, but the Court does not agree.

[47]Pl. Memo of Law [#32] at p. 11.

Court is unable to recall any other employment discrimination action that it has presided over in which the plaintiff *never* received a reprimand or unfavorable performance review.

In any event, Plaintiff further contends that there are triable issues of fact as to whether the termination of his employment was causally related to his Chron's disease. On this point, Plaintiff asserts that there are "circumstances" that would permit the inference of such a causal relationship, though he does not explain what they are.[48]

Additionally, Plaintiff asserts that there are triable issues of fact as to whether Koziel created a hostile work environment on the basis of disability, by commenting on Plaintiff's bathroom usage.  Plaintiff contends that Koziel's statements caused him to "fear" Koziel, thereby negatively affecting the "terms and conditions of his employment," and establishing a hostile work environment.[49]

Plaintiff also contends that there are triable issues of fact as to whether the Village retaliated against him for his alleged complaints to Murphy.  Plaintiff maintains that he engaged in protected activity under the ADA when he complained to Murphy about Koziel, even though he admits he never told Murphy that he had a disability or any medical problem, or that he believed Koziel perceived him as having such a disability. Plaintiff also contends that he has shown a causal relationship between his complaint about Koziel and the termination of his employment, based on temporal proximity.  On this issue, though, the Court observes that Plaintiff misleadingly attempts to include

---

[48] *See*, Pl. Memo of Law [#32] at p. 14.  Instead, Plaintiff refers the Court to Point I of his memo, which dealt with whether he resigned or was fired.  However, as discussed further below, even assuming *arguendo* that Plaintiff can establish a triable issue of fact as to whether he was fired, he has not pointed out any evidence to suggest that he was fired *because* he has Chron's disease, or even because he used the bathroom frequently.

[49] Pl. Memo of Law [#32] at p. 21.

Koziel's alleged statement that Plaintiff "won't have a job" as evidence of retaliatory

motive, by pointing out that Koziel made the comment two weeks after Plaintiff

complained to Murphy.[50]  Such argument is at odds with the evidentiary proof, though,

because at Plaintiff's deposition he testified that Koziel made the "won't have a job"

statement because he was angry that Plaintiff would not sell him a shotgun, not because

he had any information that Plaintiff had complained about him.  In reality, Plaintiff has

not offered any evidence that Koziel was aware that Plaintiff complained about him.

On June 11, 2015, counsel for the parties appeared before the undersigned for

oral argument.

ANALYSIS

### Rule 56

Summary  judgment may not be granted unless "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached

exhibits, and depositions, must be viewed in the light most favorable to the non-moving

party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate

only where, "after drawing all reasonable inferences in favor of the party against whom

summary judgment is sought, no reasonable trier of fact could find in favor of the non-

moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

### Demonstrating a Triable Issue of Fact

Before addressing the merits of the summary judgment motion, in light of Plaintiff's

submissions the Court feels it necessary to review the applicable rules concerning

---

[50]Pl. Memo of Law [#20] at p. 20.

statements of fact in summary judgment motions.  Rule 56 of the Local Rules of Civil

Procedure, entitled "Statements of Facts on Motion for Summary Judgment" (emphasis

added), states in pertinent part:

> **Movant's Statement.** Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be annexed to the notice of motion a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

> **Opposing Statement.** The papers opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried. Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

> **Citations.** Each statement by the movant or opponent pursuant to this Local Rule must be followed by citation to evidence that would be admissible, as required by Fed.R.Civ.P. 56(c)(1)(A). Citations shall identify with specificity the relevant page and paragraph or line number of the authority cited.

As the foregoing rule indicates, and as is very well settled, to create a triable issue of fact

the party opposing summary judgment must come forward with evidentiary proof in

admissible form. *See, Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290,

310 (2d Cir. 2008) ("In order to defeat a properly supported summary judgment motion,

the opposing party must proffer *admissible evidence that sets forth specific facts* showing

a genuinely disputed factual issue that is *material* under the applicable legal principles.")

(emphasis added, citations omitted); *see also, Casciani v. Nesbitt*,  392 Fed.Appx. 887, 888, 2010 WL 3467094 at *1 (2d Cir. Sep. 7, 2010) (" A party may not avoid summary judgment with assertions that are conclusory or based on speculation.") (citation and internal quotation marks omitted); *Ross v. Bilow*, 166 F.3d 1201 (table), 1998 WL 852445 at *1 (2d Cir. Dec. 1, 1998) ("The nonmoving party may not avoid summary judgment, however, by relying solely on conclusory statements or contentions that the moving party's evidence is not credible.").

A party cannot avoid summary judgment by claiming to be unable to remember facts that are asserted and properly supported by the moving party. *See, e.g., Motiva Enterprise LLC v. W.F. Shuck Petroleum*, Civil Action No. 3:10–CV–793 (JCH), 2012 WL 601245 at *14 (D.Conn. Feb. 22, 2012) (In case where individual claimed that he could not remember signing a personal guaranty, the District Court stated that "Shuck's assertion that he does not remember signing the document is not, in itself, sufficient to create a material issue of fact to defeat Motiva's Motion for Summary Judgment."); *see also, Petrunti v. Cablevision*, No. 08–CV–2277(JFB)(AKT), 2009 WL 5214495 at *11 (E.D.N.Y. Dec. 30, 2009) ("Plaintiff's lack of recollection is insufficient, however, to create a triable issue of fact."); *Dickey v. Baptist Memorial Hospital-North Mississippi*, 146 F.3d 262, 266 (5th Cir. 1998) ("The mere fact that Dr. Washington does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact. Rule 56 requires that the party opposing summary judgment point to specific evidence that creates a genuine issue of material fact.") (citation omitted).

Furthermore, a non-movant may not defeat a summary judgment motion by submitting an affidavit that contradicts his earlier sworn testimony. *Bickerstaff v. Vassar*

*College*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony.") (citation and internal quotation marks omitted), *cert den.*, 530 U.S. 1242, 120 S.Ct. 2688 (2000), *rehearing den.*, 530 U.S. 1289, 121 S.Ct. 3 (2000); *see also, Kennedy v. City of New York*, 570 Fed.Appx. 83, 84-85 (2d Cir. Jun. 24, 2014) ("We have applied this principle to affirm a grant of summary judgment against a party who testified in his deposition that he was unable to remember a particular fact, and then, in response to a summary judgment motion, submitted an affidavit claiming a recollection of events that would have raised an issue for trial.") (citation omitted).

Nor may a party create a triable issue of fact to defeat summary judgment by claiming not to understand the moving party's clear factual assertions.  As an example of this point, the Court notes that in this case, in which Plaintiff's Chron's disease is the only alleged disabling "condition," Defendant included the following assertion in its Statement of Undisputed Facts:

> 26. Plaintiff did not notify anyone working for the Village, including Koziel or Murphy, of his condition.

In response to this plain and simple statement of fact, Plaintiff, in his Response to Defendant's Local Rule 56 Statement, stated:

> Plaintiff also objects to Defendant's paragraph 26 to the extent that "condition" is too vague and ambiguous to ascertain the meaning by which Defendant uses the term.  Without waiving Plaintiff's rights and objections, the remaining facts in Defendant's paragraph 26 are not disputed for purposes of the pending motion for summary judgment only.

(Docket No. [32-1] at p. 15).  Plaintiff's counsel is hereby cautioned that such a response is disingenuous and wasteful of the Court's time and of opposing counsel's time.  The response is clearly disingenuous since it is obvious that Defendant was referring to Plaintiff's Chron's disease, which is the only "condition" in this action.  Counsel's feigned confusion is all the more unconvincing since he already acknowledged as a matter of fact, in his application to amend the original Complaint, that Plaintiff's prior counsel's assertion, that the Village had actual notice of Plaintiff's Chron's disease, was a "false allegation."  Since the Court has no doubt that Plaintiff's counsel understood Defendant's statement and knew that it was true, he should have merely acknowledged that such fact was undisputed, rather than trying to muddy the waters.

Lastly, Plaintiff's counsel erroneously argues that the statements attributed to Plaintiff by Koziel and Murphy are inadmissible hearsay. *See*, Pl. Resp. to Defs. Stmt. of Facts [#32-1] at ¶¶  7, 9.[51]  It is of course basic that when a party's own out-of-court statements are offered against him they are admissible under Rule 801(d)(2)(A). *See, e.g., U.S. v. Pluta*, 176 F.3d 43, 47 (2d Cir. 1999) (Observing that a party's "own out-of-court statements offered against him are, by definition, not hearsay."). Consequently, it is clear that at trial Koziel and Murphy would be able to testify as to the statements that they heard Plaintiff make, including his statements that he was quitting his job.[52]  To the extent Plaintiff's counsel meant that the Village's citation to Koziel's and Murphy's deposition *transcripts* was improper, because the transcripts are hearsay, he is

---

[51] Plaintiff's counsel makes a similarly baseless hearsay argument concerning Murphy at pp. 6-7 and n.3 of Plaintiff's memo of law [#32].

[52] Plaintiff's counsel obviously has some familiarity with the concept of a party admission, since at oral argument he argued that Police Chief Case's statement, that Plaintiff was being terminated, should be admissible against the Village as an admission by a party opponent.

similarly mistaken. *See, e.g., Macshane v. City of New York*, 2015 WL 1298423 at *4, n.4 (E.D.N.Y. Mar. 23, 2015)  ("[A] transcript of a deposition, may not be in a form that is admissible, but the underlying testimony would be admissible at trial subject to its compliance with the Federal Rules of Evidence, and therefore may be considered by the Court at the summary judgment phase.") (citation omitted); *see also, Jackson v. Federal Exp.*, 766 F.3d 189, 194 (2d Cir. 2014) ("Such a statement [of facts supporting a summary judgment motion] must *reference* admissible evidence (when presented at trial in the form of testimony or other permissible method) in the record tending to prove each such fact, *e.g., deposition testimony*, admissions, answers to interrogatories, affidavits, etc.") (emphasis added, citations omitted).

With these preliminary points in mind the Court will now consider the merits of the Village's application.

<u>*The Discrimination Claim*</u>

Plaintiff contends that the Village discriminated against him, on the basis of a perceived disability, by terminating his employment.  To establish a discrimination claim under the ADA, a plaintiff must demonstrate that

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.

*Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) (citations omitted). "Disability" under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in

19

paragraph (3))." 42 U.S.C.A. § 12102(1) (Westlaw 2015).  Further,

> [a]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity[,]

excluding impairments "with an actual or expected duration of 6 months or less." 42 U.S.C.A. § 12102(3)(A) & (B) (Westlaw 2015).

In this case, Plaintiff contends that there are issues of fact as to whether he resigned or was fired, though the Court does not agree.[53]  However, even assuming *arguendo* that there are issues of fact as to whether he was fired, Plaintiff has not come forward with any proof that the Koziel, Murphy or anyone else associated with the Village perceived him as having an impairment within the meaning of 42 U.S.C. § 12102(3)(A). At most, the record indicates that Koziel thought that Plaintiff had a habit of taking too long in the bathroom.  Accordingly, his claim cannot succeed. *See, Luciano v. City of Rochester*, No. 08–CV–6264, 2010 WL 891037 at *2 (W.D.N.Y. Mar. 10, 2010) ("Because an employer can not be liable for disability discrimination if the employer did not know that the employee suffered a disability, or regarded the employee as suffering from a disability, I find that plaintiff has failed to state a claim of disability discrimination.") (*citing Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 725 (2d Cir. 1994), *cert den.* 513 U.S. 1147, 115 S.Ct. 1095 (1995)); *see also, Jules v. Village of Obetz Police Dept.*, No. 2:11–CV–582, 2013 WL 4832893 at *10 (S.D.Ohio Sep. 11, 2013) ("Plaintiff also states

---

[53] In this regard the record suggests that Koziel may not have taken Plaintiff seriously when he said that he "quit" on June 22nd, but the Village treated Plaintiff's comments on June 27th, during the conversation with the Mayor, as a resignation.

that he told his supervisor that he was experiencing memory issues. There is also no evidence that Plaintiff's supervisor was informed that Plaintiff's memory lapses were due to impairment. An employer cannot discriminate against an employee on the basis of a disability when it is unaware that the disability exists.").

Further, even assuming that Plaintiff could show that the Village perceived him as having an impairment, he has not provided any evidence to suggest that such perception had anything to do with the termination of his employment.  On this point, to the extent that Plaintiff is suggesting a temporal nexus between Koziel's bathroom comments and the termination of his employment, the Court does not agree that he has shown a triable issue of fact as to an ADA claim, since Koziel never suggested that Plaintiff's actual work performance was suffering due to him being in the bathroom.  For example, Koziel never accused Plaintiff of shirking any of his duties due to being in the bathroom, or suggested that Plaintiff's bathroom habits warranted the termination of his employment.  In this regard, the Court is mindful that Koziel was only at the Water Plant for a fraction of each day, usually in the early morning, and therefore was not in a position to gauge how much time Plaintiff actually spent in the bathroom each day.  Nor is there any indication that Koziel, who did not have the authority to hire or fire Plaintiff, related any dissatisfaction with Plaintiff's job performance or bathroom habits to  Murphy or to the Village Board. Accordingly, any suggestion that the Village terminated Plaintiff's employment because it thought that he spent too much time in the bathroom would be purely speculative.

### *The Retaliation Claim*

Plaintiff further contends that the Village retaliated against him after he complained about discrimination on the basis of a perceived disability.  Specifically, Plaintiff maintains

that he engaged in protected activity when he told Murphy that Koziel was "harassing" him.  With regard to this claim it is sufficient to note that in order to engage in protected activity under the ADA, a plaintiff must provide enough information to the person to whom he is complaining to allow such person to reasonably understand that the plaintiff is complaining of conduct prohibited by the ADA. *See, Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by [the pertinent federal anti-discrimination statute].") (citation and internal quotation marks omitted).  Here, Murphy neither understood that Plaintiff was complaining about disability-based discrimination, nor reasonably should have done so based on what Plaintiff told him.  Accordingly, while Plaintiff may have complained about Koziel, he did not engage in protected activity under the ADA.

Apart from that, in light of the entire record, including Plaintiff's conduct on June 22nd and June 27th, Plaintiff has also not shown a causal relationship between his complaints and the termination of his employment.  That is, assuming *arguendo* that the Village actually fired Plaintiff as he maintains, there is no reason to think that his complaints about Koziel had anything to do with his firing, given that the Village fired him immediately after he made insubordinate and arguably threatening statements to his supervisors, and implied to a citizen that there was an impending problem with the water supply.  *See, Nolly v. Swiss Reinsurance America Corp.*, 857 F.Supp.2d 441, 461 (S.D.N.Y. 2012)  ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might

otherwise suffice to raise the inference."), *aff'd*, 523 Fed.Appx. 53 (2d Cir. Jun. 27, 2013).

Accordingly, Defendant is entitled to summary judgment on the retaliation claim.

*The Hostile Work Environment Claim*

Plaintiff also contends that Koziel created a hostile work environment on the basis of a perceived disability.  Although the Second Circuit has not yet decided whether hostile environment claims are actionable under the ADA, it has suggested that if they are, they are subject to the same standards that apply to hostile environment claims under Title VII. *See, Robinson v. Dibble*, — Fed.Appx. — , 2015 WL 3372190 at 2 & n. 2 (2d Cir. May 26, 2015) ("Assuming without deciding" that ADA hostile environment claims are actionable). In that regard, it is clear that to have an actionable claim, the perpetrator must inflict or create the hostile environment "because of" the plaintiff's "protected characteristic," which in this case would be the perception of disability. *See, Gordon v. City of New York*, — Fed.Appx. — , 2015 WL 2402705 at *2 (2d Cir. May 21, 2015) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable only when it occurs because of an employee's protected characteristic.") (citation and internal quotation marks omitted).

In the instant case, for the reasons already mentioned it is clear that Plaintiff cannot show that Koziel created a hostile environment "because of" Plaintiff's perceived disability, since Koziel did not perceive that Plaintiff had a disability.  Moreover, even assuming that Koziel had perceived such a disability, his handful of alleged comments over a period of six months were not sufficiently "severe or  pervasive" to establish a hostile work environment. *See, Robinson v. Dibble*, 2015 WL at *2 ("A plaintiff alleging a hostile work environment must prove either that the conduct complained of was

23

sufficiently continuous and concerted to be considered pervasive, or that a single episode was severe enough to establish a hostile working environment.") (citation and internal quotation marks omitted); *see also, Adams v. Festival Fun Parks, LLC*, No. 13–1183–cv, 560 Fed.Appx. 47, 51 (2d Cir. Mar. 21, 2014) ("[The ADA]  does not create a general civility code for the American workplace, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.  The incidents of allegedly offensive conduct must also be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (citations and internal quotation marks omitted).  In the instant case, the Court views Koziel's alleged comments as "simple teasing" and "isolated incidents" which, while certainly inappropriate were not sufficiently severe or pervasive to meet the standard for a hostile environment claim.

## CONCLUSION

Defendant's motion for summary judgment [#26] is granted and this action is dismissed with prejudice.

SO ORDERED.

Dated: Rochester, New York
        June 22, 2015

ENTER:

/s/ Charles J. Siragusa____
CHARLES J. SIRAGUSA
United States District Judge